

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| SHERRI GREEN, | § | No. 08-22-00175-CV |
| Appellant, | § | Appeal from the |
| v. | § | 394th Judicial District Court |
| LAJITAS CAPITAL PARTNERS, LLC, MCREYNOLDS LAJITAS INTERESTS, LLC, QUINT DAVIS, JOHN PRICE and LOGAN KNAPP, | § | of Brewster County, Texas |
| | § | (TC# CVB21565) |
| Appellees. | | |

**MEMORANDUM OPINION**

Appellant filed a lawsuit against Appellees claiming their negligence caused her to be injured when she fell from a horse during a trail ride at a resort. Appellees filed a motion for summary judgment, arguing that Appellant's lawsuit was barred by a release agreement that she signed prior to the ride and by the Texas Equine Act. The trial court granted the motion. Because we conclude that Appellant signed a valid release agreement waiving her right to sue Appellees for their alleged negligence, we affirm the trial court's judgment.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The accident

In June 2020, Appellant Sherri Green (Sherri), along with her husband, Hall Green (Hall), and other family members paid to participate in a sunset trail ride at the Lajitas Resort (the Resort) in Lajitas, Texas. The ride began and ended at the Lajitas Stables (the Stables) at the Resort. The ride consisted of six guests, including Sherri and her family members, as well as a guide—Appellee Quint Davis—and his teen-aged daughter. On their return to the Stables, the horses were traveling along a path next to the Resort's golf course when a set of underground sprinklers activated, making a "hissing" sound that "spooked" the horses. According to Davis, most of the horses turned suddenly and sped up for a few steps, which caused Sherri and another guest to fall from their horses.[1] Sherri and her husband contend that Sherri's horse "bucked wildly" and violently threw Sherri to the ground. The parties agree that Sherri fractured her wrist and was bruised in the fall. Sherri was treated at a nearby hospital.

### B. The lawsuit

Sherri filed her lawsuit against the various Appellees affiliated with the Lajitas Resort (the Lajitas Defendants) claiming she was an invitee at the Resort and their negligence caused her injuries.[2] In particular, Sherri alleged the sprinklers constituted a "dangerous latent condition of

---

[1] Davis assessed partial blame on the two riders for not following his instructions to keep pressure on the side of their horses during the ride.

[2] The defendants included Logan Knapp, the golf course superintendent in charge of the Resort's sprinkler system, Quint Davis, the trail ride guide and director of the equestrian center at the Resort, and John Price, the Resort general manager.

land" and the defendants negligently failed to guard against the danger by allowing the horses to come close to the sprinklers knowing the sprinklers were scheduled to activate.[3]

Following a discovery period, the Lajitas Defendants filed a traditional motion for summary judgment contending Sherri's claims failed as a matter of law due to (1) a release agreement Sherri signed prior to the ride that released them from liability for alleged negligence (the Release Agreement); and (2) the Texas Equine Act, which, among other things, shield an individual from liability for personal injury arising from a "farm animal activity" when an injury results from the animal's unpredictable reaction to a sound or object or from "certain land conditions and hazards, including surface and subsurface conditions."[4] The Lajitas Defendants attached to their motion the Release Agreement Sherri signed and Sherri's admission that she signed the form.[5]

Sherri contended, among other things, that the Release Agreement did not bar her claim for two reasons. First, the Release Agreement only applied to occurrences arising from the

---

[3] Sherri also alleged that the defendants failed to properly select, adequately train, and/or adequately monitor their employees.

[4] The Texas Equine Act provides that, except for certain instances, "all persons . . . are not liable for . . . damages arising from the personal injury or death of a participant in a farm animal activity . . . if the . . . injury, or death results from the dangers or conditions that are an inherent risk of a farm animal [or] farm animal activity . . . including (1) the propensity of a farm animal or livestock animal to behave in ways that may result in personal injury or death to a person on the animal . . . ; (2) the unpredictability of a farm animal's or livestock animal's reaction to sound, a sudden movement, or an unfamiliar object . . . ; (3) with respect to farm animal activities involving equine animals, certain land conditions and hazards, including surface and subsurface conditions." TEX. CIV. PRAC. & REM. CODE ANN. § 87.003.

[5] In the trial court, Sherri initially objected that the Lajitas Defendants did not authenticate the Release Agreement as required by the Texas Rules of Evidence and that the trial court should not consider it. However, in their third amended motion for summary judgment, the Lajitas Defendants attached Sherri's responses to their request for admissions, in which she admitted she had signed the form. This constituted a judicial admission that relieved the Lajitas Defendants of their burden to authenticate the form and barred Sherri from contesting its authenticity. *See generally ReadyOne Indus., Inc. v. Flores*, 460 S.W. 3d 656, 665 (Tex. App. El Paso 2014, pet. denied) (recognizing that a matter admitted in response to a request for admissions is conclusively established and constitutes a judicial admission that acts as a formal waiver of proof).

"elements of nature," and this incident arose from a man-made rather than a natural condition. Second, the Release Agreement was "insufficiently specific to constitute a valid waiver under Texas Law."

Sherri argued that the Texas Equine Act did not bar her claim, as it does not apply when the "injury or death was caused by a dangerous latent condition of land for which warning signs, written notices, or verbal warnings were not conspicuously posted or provided to the participant" and where the landowner or its agents "knew of the dangerous latent condition." TEX. CIV. PRAC. & REM. CODE ANN. § 87.004(3). And, she argued, the Lajitas Defendants were aware of the danger the sprinklers posed and admittedly failed to warn her about it. [6]

Following a hearing, the trial court granted the Lajitas Defendants' motion for summary judgment without identifying which ground it relied upon in doing so. This appeal followed.

## II. ISSUES ON APPEAL

Raising two issues on appeal, Sherri argues the trial court erred in granting summary judgment because (1) the Release Agreement was unenforceable, as it was overly broad, did not meet the fair notice requirements imposed on such agreements, and did not specifically cover her particular claim of negligence for accidents resulting from man-made conditions on the premises; and (2) questions of fact remained on whether her claim fell within the Texas Equine Act exceptions for dangerous latent conditions on the land. For the reasons set forth below, we conclude the Release Agreement validly released the Lajitas Defendants from liability for Sherri's negligence claim. As such, we need not address whether the Texas Equine Act also bars her claim.

---

[6] Sherri pointed out that there had been at least one prior incident in which the Resort's horses had become "spooked" during a trail ride when the sprinklers activated. And she pointed out that the Lajitas Defendants admitted they had not posted any warning signs about the danger and failed to otherwise warn her about it.

4

## III. STANDARD OF REVIEW

An appellate court reviews a trial court's grant of summary judgment de novo. *Eagle Oil & Gas Co. v. TRO-X, L.P.*, 619 S.W.3d 699, 705 (Tex. 2021) (citing *Nall v. Plunkett*, 404 S.W.3d 552, 555 (Tex. 2013)). In a traditional summary judgment motion, the moving party must show that no genuine dispute exists as to any material fact such that the party is entitled to judgment as a matter of law. *Id* (citing TEX. R. CIV. P. 166a(c)). A defendant may obtain a summary judgment by conclusively establishing an affirmative defense, such as the existence of a valid release agreement. *Id.* (citing *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010)).

We review the summary judgment record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Id.* (citing *Goodyear Tire & Rubber Co. v. Mayes*, 236 S.W.3d 754, 756 (Tex. 2007)). And we take as true all evidence favorable to the nonmovant. *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019) (citing *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003)). When a trial court's order granting summary judgment does not specify the grounds for its ruling, summary judgment will be affirmed on appeal if any of the theories the movant advances is meritorious. *See Carr v. Brasher*, 776 S.W.2d 567, 569 (Tex. 1989); *see also Garcia v. J.J.S. Enterprises, Inc.*, 225 S.W.3d 57, 64 (Tex. App.—El Paso 2005, no pet.).

## IV. RELEASE AGREEMENTS AND THE FAIR NOTICE RULE

A release is a contractual arrangement whereby one party assumes the liability inherent in a situation and relieves the other party in advance of liability for its own negligence. *Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 507-08 (Tex. 1993). "It operates to extinguish the claim or cause of action as effectively as would a prior judgment between the parties and is an absolute bar to any right of action on the released matter." *Id.* (citing *Hart v. Traders &*

*General Ins. Co.*, 189 S.W.2d 493, 494 (Tex. 1945)). Accordingly, a release is an affirmative defense to liability. *Id.* (citing TEX. R. CIV. P. 94 (categorizing a release as an affirmative defense)).

To be enforceable, a release of liability for future negligence must satisfy the two prongs of the "fair notice requirements." *See Storage & Processors, Inc. v. Reyes*, 134 S.W.3d 190, 193 (Tex. 2004). The first prong is the "express negligence doctrine," which provides that the intent to release a party to a contract from any future negligence claims "must be specifically stated in the four corners of the contract." *Id.* (citing *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 708 (Tex. 1987); *see also Permian Corp. v. Union Tex. Petroleum Corp.*, 770 S.W.2d 928, 929 (Tex. App.—El Paso 1989, no writ) (discussing the requirements of the "express negligence doctrine"). The second prong is the "conspicuousness" component, which requires "that something must appear on the face of the [contract] to attract the attention of a reasonable person" to the release provisions in the contract. *See Reyes*, 134 S.W.3d at 192 (citing *Dresser*, 853 S.W.2d at 508). This prong may be satisfied when the release language in the contract appears in larger type, capital letters, contrasting colors, or otherwise "call[s] attention to itself." *Id.* (citing *Littlefield v. Schaefer*, 955 S.W.2d 272, 274–75 (Tex. 1997)); *Garcia*, 225 S.W.3d at 63–64; *see also* TEX. BUS. & COM. CODE ANN. § 1.201.[7]

Whether a release agreement complies with the fair notice requirements is a question of law for a court to decide. *Dresser*, 853 S.W.2d at 509; *see also David v. Howeth*, No. 02-20-00078-CV, 2020 WL 6165298, at *6 (Tex. App.—Fort Worth Oct. 22, 2020, pet. denied) ("The

---

[7] "Conspicuous," "with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it. Whether a term is 'conspicuous' or not is a decision for the court. Conspicuous terms include the following: (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language." TEX. BUS. & COM. CODE ANN. § 1.201(b)(10).

interpretation of a release is a question of law to be decided by the trial court and reviewed de novo on appeal"); *Reyes*, 134 S.W.3d at 192 (recognizing that a "contract which fails to satisfy either of the fair notice requirements when they are imposed is unenforceable as a matter of law").

## V.  THE ADEQUACY OF THE RELEASE FORMS

### A.  The release agreement

The Release Agreement Sherri signed prior to the trail ride was labeled in bold, capitalized letters as follows:

> **HORSE RENTAL, EQUISTRIAN, GUIDE & OUTFITTER SERVICES AGREEMENT, LIABLITY RELEASE AND ASSUMPTION OF RISK AGREEMENT (FOR INDIVIDUALS).**

The agreement contained several paragraphs, each of which Sherri initialed, including:

.       .       .

> C.  <u>INHERENT RISKS/ASSUMPTION OF RISKS</u>: I/WE ACKNOWLEDGE THAT: Horseback riding is classified as [a] RUGGED ADVENTURE RECREATIONAL SPORT ACTIVITY and that risks, conditions and dangers are inherent . . . regardless of all feasible safety measures which can be taken and **I AGREE TO ASSUME ALL SUCH RISKS, CONDITIONS AND/OR DANGERS.** The inherent risks include, but are not limited to any of the following: The propensity of [an] animal to behave in ways that may result in injury, harm, death, or loss to persons on or around the animal: The unpredictability of an equine's reaction to sounds, sudden movement, unfamiliar objects, persons, or other animals. Hazards, including but not limited to, surface or subsurface conditions . . . the potential of an equine activity participant to act in a negligent manner that may contribute to injury, harm or death . . . including . . . by failing to maintain control over an equine. . . . If a horse is frightened or provoked it may divert from its training and act according to its natural survival instincts which may include . . . Stopping short, Spinning around, Changing directions and/or speed at will; Shifting its weight; /Bucking; Rearing . . . and/or Running from danger. I acknowledge that these are just some of the risks and I agree to assume others not mentioned.

> D.  <u>WILDERNESS EXPERIENCE PARTICIPATION, CONDITIONS OF NATURE WARNING, UNFAMILIAR AND SUDDEN SIGHTS, SOUNDS, AND MOVEMENTS WARNING, AND INSPECTION OF PREMISES</u> I/WE ACKNOWLEDGE THAT: The participant may be taking party in a "WILDERNESS EXPERIENCE" that may be hazardous to people. . . . **I/WE ACKNOWLEDGE THAT: THIS STABLE IS <u>NOT</u> RESPONSIBLE FOR TOTAL OR PARTIAL ACTS, OCCURRENCES, OR ELEMENTS OF NATURE AND/OR SUDDEN AND/OR UNFAMILIAR SIGHTS SOUNDS AND/OR SUDDEN MOVEMENTS THAT CAN SCARE A HORSE, CAUSE IT TO FALL, OR REACT IN SOME OTHER UNSAFE WAY.** SOME EXAMPLES ARE: . . . natural and man-made changes in landscape. I also acknowledge that these are just some of the risks and I agree to assume other risks not mentioned above.

7

. . .

**J.** <u>**LIABILITY RELEASE:**</u> I/WE AGREE THAT: In consideration and as a condition of **THIS STABLE** allowing me . . . participation in this activity, under the terms set forth herein, I for myself...**DO AGREE TO AND DO HEREBY RELEASE, HOLD HARMLESS, AND DISCHARGE THIS STABLE [**and various Lajitas entities referred to as the "**RELEASEES"]** of and from any and all claims, demands, causes of action and legal liability, whether the same be known or unknown, anticipated or unanticipated, whether based in contract, in tort or otherwise, **DUE TO THIS STABLE'S AND/OR THE RELEASEE'S NEGLIGENCE, ACTS OR OMISSIONS OR LEGAL LIABILITY,** for any economic and/or non-economic losses due to bodily injury and/or death...sustained by me...in relation to the premises and operations of **THIS STABLE,** to include while riding . . . whether on or off the premises of **THIS STABLE.**[8]

In addition, the Release Agreement contained a general provision, which Sherri also initialed, indicating it was to be "legally binding" upon the participants and their heirs and assigns. Sheri signed and dated the following provision at the end:

**SIGNER STATEMENT OF AWARENESS**

**I/WE THE UNDERSIGNED, REPRESENT THAT I/WE HAVE READ AND DO UNDERSTAND THE FOREGOING AGREEMENT, LIABILITY RELEASE, AND ASSUMPTION OF RISK AGREEMENT. I/WE UNDERSTAND THAT BY SIGNING THIS DOCUMENT I/WE AM GIVING UP RIGHTS TO SUE TODAY AND IN THE FUTURE. I/WE ATTEST THAT ALL FACTS ARE TRUE AND ACCURATE. I AM SIGNING THIS WHILE OF SOUND MIND AND NOT SUFFERING FROM SHOCK, OR UNDER THE INFLUENCE OF ALCOHOL, DRUGS OR INTOXICANTS**

**B. Sherri's procedural argument: the nature of the summary judgment motion**

Before discussing whether the Release Agreement meets the fair notice requirements, we address Sherri's contention that the Lajitas Defendants waived their right to rely on the entire Release Agreement, as they did not rely on the entire agreement in their summary judgment motion. Sherri points out that in the argument section of the Lajitas Defendants' summary judgment motion in which they argued that the release language was "clear" and that the warnings

---

[8] The Release Agreement also contained a section labeled "**EQUINE ACTIVITY LIABILITY ACT (EALA) WARNING OF LANGUAGE**" indicating that it was attaching a copy of the Texas Act, which contains the following language: UNDER TEXAS LAW. . . AN EQUINE PROFESSIONAL IS NOT LIABLE FOR AN INJURY TO . . . A PARTICIPANT IN EQUINE ACTIVITIES RESULTING FROM THE INHERENT RISK OF EQUINE ACTIVITIES."

in the release were "conspicuously written to attract [Sherri's] attention," the defendants only focused on the following three sentences from the Agreement:

- I agree to assume all such risks, conditions and/or dangers.

- I/we acknowledge that: this stable is not responsible for total or partial acts, occurrences, or elements of nature and/or sudden and/or unfamiliar sights sounds and/or sudden movements that can scare a horse, cause it to fall, or react in some other unsafe way.

- Do agree to and do hereby release, hold harmless, and discharge this stable ....

Sherri contends that because the Lajitas Defendants did not rely on any of the remaining provisions in the Release Agreement to support their summary judgment motion, they may not rely on them in their appellate briefing nor may we affirm the judgment on that basis. Sherri cites the Texas Supreme Court's opinion in *Johnson v. Brewer & Pritchard, P.C.,* for the proposition that an appellate court may not consider "grounds" that a party failed to raise in the trial court in affirming a trial court's decision to grant summary judgment. 73 S.W.3d 193, 204 (Tex. 2002); *see also* TEX. R. CIV. P. 166a(c) ("The motion for summary judgment shall state the specific grounds therefor."). The Court's opinion in *Johnson*, however, is inapposite.

In *Johnson*, the defendants moved for summary judgment on the plaintiff's conspiracy and conversion claims, arguing there was no evidence to support the elements of either claim. *Id*. The trial court, however, granted summary judgment on a third claim—breach of fiduciary duty—which was not raised in the defendant's motion. Recognizing that a court may not grant summary judgment on a claim not addressed in a summary judgment motion, the Texas Supreme Court held that the trial court erred in granting summary judgment on the plaintiff's breach claim. *Id*.

Here, Sherri only raised one claim for relief: negligence. And in their summary judgment motion, the Lajitas Defendants squarely raised the issue of whether the Release Agreement barred Sherri from raising that claim. They not only set forth the entire Release Agreement in the motion's fact section, but they also attached the entire agreement as an exhibit to the motion along with

9

Sherri's admission that she signed it prior to the trail ride. Accordingly, while they may have focused on the three sentences they found significant in the Release Agreement in the argument section of their motion, it is clear that the "ground" for their motion was, and remains, that Sherri waived her right to sue them for negligence when she signed the Release Agreement.

Accordingly, rather than raising a new "ground" in their appellate briefing, at most, the Lajitas Defendants are simply expanding and refining their argument on appeal in support of this ground by directing our attention to all of the relevant agreement provisions. As Texas courts have repeatedly recognized, although a party may not raise new "issues" on appeal, they may raise new or more refined "arguments" in support of issues properly raised in the trial court. *See generally Matter of Estate of Wharton*, 632 S.W. 3d 597, 607 n.5 (Tex. App.—El Paso 2020, no. pet) (recognizing that when issues are properly raised in a summary judgment motion, the moving party is free to reframe or refine his arguments on those issue on appeal) (citing *Greene v. Farmers Ins. Exch.*, 446 S.W. 3d 761, 764, n. 4 (Tex. 2014) ("We do not consider *issues* that were not raised in the courts below, but parties are free to construct new *arguments* in support of issues properly before the court.").

Moreover, the Lajitas Defendants' summary judgment motion contained sufficient references to the Release Agreement as a whole to put Sherri on notice that they intended to rely on the entire agreement when arguing that she waived her right to bring her negligence claim; therefore, she was not deprived of her ability to adequately respond. *See generally Camden Mach. & Tool, Inc. v. Cascade Co.*, 870 S.W.2d 304, 309-10 (Tex. App.—Fort Worth 1993, no writ) (purpose of requirement that summary judgment motion state specific grounds thereof is to provide opposing party with adequate information for opposing motion and to define issues for purpose of judgment) (citing *Westchester Fire Ins. Co. v. Alvarez*, 576 S.W.2d 771, 772 (Tex. 1978)).

Finally, we note that we may, and should, consider the entire Release Agreement when determining as a matter of law whether it constituted an enforceable contract that released the Lajitas Defendants from Sherri's negligence claim. *See Quintana v. CrossFit Dallas, L.L.C.*, 347 S.W.3d 445, 451–52 (Tex. App.—Dallas 2011, no pet.) (looking to all provisions in the parties' agreement to determine whether the intent to release the defendant from liability was expressed therein); *Banta Oilfield Services, Inc. v. Mewbourne Oil Co.*, 568 S.W.3d 692, 714 (Tex. App.— Texarkana 2018, pet. denied) (looking to all provisions in the parties' indemnity agreement to determine their intent) (citing *Enserch Corp. v. Parker*, 794 S.W.2d 2, 6–8 (Tex. 1990) (recognizing "an indemnity agreement need not be confined to one sentence" when "the contract as a whole is sufficient to define the parties' intent that [the indemnitor] indemnify [the indemnitee] for the consequences of [the indemnitee's] own negligence."); *see generally Baby Dolls Topless Saloons, Inc. v. Sotero*, 642 S.W.3d 583, 587 (Tex. 2022) (recognizing that a court must construe a contract as a whole in determining the parties' intent when they signed it). We therefore decline to adopt Sherri's overly narrow view of the preservation rules that would effectively prevent us from determining the true intent of the parties and the Release Agreement enforceability. *See generally Adams v. Starside Custom Builders, LLC*, 547 S.W. 3d 890, 896-97 (Tex. 2018) (recognizing that a court of appeals should not apply the rules of error preservation "so strictly as to unduly restrain" the court from reaching the merits of a case).

Accordingly, we will consider the entire Release Agreement in determining whether it meets the fair notice requirements.

### C. The Release Agreement met the fair notice requirements

#### 1. The conspicuousness requirement

In her appellant's brief, Sherri did not argue that the Release Agreement failed to meet the "conspicuousness" prong of the fair notice requirements; instead, she raises the issue for the first time in her reply brief. A party may not raise new issues for the first time in a reply brief. *See, e.g.*, *Watret v. Watret*, 623 S.W.3d 555, 563-64 (Tex. App.—El Paso 2021, no pet.) (recognizing that Rule 38.3 of the Texas Rules of Appellate Procedure restricts a reply brief to addressing only matters raised in appellee's brief and may not be utilized to present a new issue to the court). We therefore conclude that Sherri did not properly preserve this issue for our review.

Even if we were to overlook this procedural deficiency, we do not agree with Sherri's argument that the Release Agreement failed to meet the conspicuousness requirement. Sherri primarily relies on the Texas Supreme Court's opinion in *Dresser*, where the court held that the conspicuousness requirement was not met because the release provisions were located on the back of the contract in a "series of numbered paragraphs without headings or contrasting type" and were contained in "uniformly printed and spaced paragraphs." *Dresser*, 853 S.W.2d at 511 and n.6. Nothing in the contract directed the reader's attention to those provisions. Accordingly, the court concluded that the release provisions were unenforceable. *Id.* at 511-12.

Here, however, the Release Agreement itself started with the heading, "Liability Release and Assumption of Risk Agreement," in bold, capitalized letters. The Liability Release paragraph, which Sherri initialed, started with the words "Liability Release" in bold, capitalized letters, underlined and in large font. The body of the Liability Release paragraph stated—again in bold, capitalized letters—that Sherri agreed to release, hold harmless, and discharge the various Lajitas Defendants for any alleged negligence. The "Assumption of Risks" and the "Wilderness

12

Experience" paragraphs, both of which Sherri also initialed, contained bold, capitalized letters in large font stating that Sherri was assuming the risk for any dangers inherent in the trail ride and that the Stable was "not responsible for total or partial acts, occurrences, or elements of nature and/or sudden and/or unfamiliar sights sounds and/or sudden movements that can scare a horse, cause it to fall, or react in some other unsafe way."

These highlighted provisions, together with the fact that Sherri initialed each paragraph, were sufficient to alert Sherri that she was releasing the Lajitas Defendants from any future claim of negligence with regard to any injuries she might suffer during the trail ride. *See Sydlik v. REEIII, Inc.*, 195 S.W.3d 329, 332–33 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (conspicuousness requirement was met where a release agreement, which was only one page with three paragraphs, contained a statement in "large, bolded, underlined letters at the top of the page that it is an agreement and a release" and where the plaintiff initialed each paragraph).

Sherri, however, appears to be arguing that the Release Agreement fails the conspicuousness test because only certain terms in the Agreement were in bold, capitalized letters while other terms were not. But Sherri does not cite any authority for the proposition that all of the terms relating to the release provisions were required to be highlighted. And to the contrary, as our sister court has recognized, the conspicuousness requirement is met if the key terms in the agreement are sufficiently highlighted such that the reader's attention is drawn to them. *See, e.g., Tutle & Tutle Trucking, Inc. v. EOG Res., Inc.*, 391 S.W.3d 240, 246 (Tex. App.—Waco 2012, pet. dism'd) (rejecting similar argument that the entire paragraph setting forth the terms of a release had to be highlighted, where the key terms were in bold, capitalized letters, which drew the signatories' attention to them). And as set forth above, we believe that they were.

13

Next, we turn our attention to whether the Release Agreement language was sufficient to satisfy the express negligence requirement and to cover Sherri's particular claim.

## 2. The express negligence requirement

Sherri argues the Release Agreement fails to meet the "express negligence" requirements for two reasons. First, she claims that the agreement was overly broad and ambiguous. Second, she argues that it only covered accidents occurring from natural conditions on the premises rather than man-made ones. We disagree with both arguments.

### a. The Release Agreement was sufficiently specific as to the negligence claim

First, Sherri argues the Release Agreement was too "broad" and "ambiguous" and did not state the parties' intent "in specific terms within the four corners of the contract" to waive a specific claim; instead, according to Sherri, the agreement was so broad that it purported to waive her right to "sue for anything." Sherri is correct that the express negligence rule requires an express statement that the signing party is releasing his or her claim for "negligence"; to be enforceable, it may not simply state that the party is releasing all claims, damages or losses, without specifying the nature of any such claims. *See Stanford v. Evans*, No. 14–08–00776–CV, 2010 WL 2517675, at *2-3 (Tex. App—Houston [14th Dist.] June 24, 2010, no pet.) (mem.op.) (a broad provision purporting to hold a party harmless from "any claims or damages no matter how caused" does not reflect a specific and unambiguous intent to waive liability for negligent acts); *Trinity Indus., Inc. v. Ashland, Inc.*, 53 S.W.3d 852, 869 (Tex. App.—Austin 2001, pet. denied) (agreement stating party was released from "all claims . . . and liabilities . . . of any nature whatsoever" was not sufficiently specific to bar claims for negligent misrepresentation and fraud under the express negligence doctrine); *Safeway, Inc. v. PDX, Inc.*, 676 Fed. Appx. 229, 233 (5th Cir. 2017) ("broad statements of indemnity" are insufficient to satisfy the express negligence rule).

14

Express language in a release agreement is to protect and provide notice to unsuspecting parties when the other party seeks to exculpate itself from its own future negligence. *See Green Intern., Inc. v. Solis*, 951 S.W.2d 384, 386-87 (Tex. 1997); *Dresser*, 853 S.W.2d at 508; *Atlantic Richfield Co. v. Petroleum Pers., Inc.*, 768 S.W.2d 724, 726 (Tex. 1989). Stated another way, it was intended to prevent scriveners from releasing or indemnifying a party for its own negligence in advance by drafting the exculpating language "just ambiguous enough to conceal that intent." *Ethyl Corp.*, 725 S.W. 2d at 707-08.

But courts have held that to satisfy the express negligence requirement, a release agreement need only "mention" that it is intended to cover a party's acts of negligence. *See, e.g.*, *Sydlik*, 195 S.W.3d at 332–33 (a provision must "mention" the claim to be released to meet the requirements of the express negligence rule) (citing *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 938 (Tex. 1991) ("In order to effectively release a claim in Texas, the releasing instrument must 'mention' the claim to be released."); *Atlantic Richfield Co.*, 768 S.W.2d at 725-26 (language specifically referring to "any negligent act or commission of [the released party]" was sufficient to define the parties' intent) *Reyes*, 134 S.W.3d at 192 (law requires intent to shift the risk of one party's negligence to the other party to be "specifically stated"). In fact, courts have recognized that the rule does not necessarily require use of the word "negligence" for the claim to be "mentioned"; it is enough if the parties' intent to be released for a negligence claim is otherwise clear from the language used. *See Lehmann v. Har–Con Corp.*, 76 S.W.3d 555, 562 n. 3 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *Rackley v. Advanced Cycling Concepts Inc.*, No. 13- 08-00254-CV, 2009 WL 937205, at *5 (Tex. App.—Corpus Christi–Edinburg Mar. 19, 2009, pet. denied) (mem. op.) (release agreement made intent to release party from any future negligence claims clear without using word "negligence"); *Banzhaf v. ADT Sec. Sys. Sw., Inc.*, 28 S.W.3d 180,

189 (Tex. App.—Eastland 2000, pet. denied) (the "test is whether the parties made it clear in the agreement that it was their intent to provide for indemnification of the indemnitee's own negligent acts" notwithstanding omission of word "negligence").

Here, the "Liability Release" paragraph expressly released any claims or causes of action in "tort or otherwise" that Sherri might have against the Lajitas Defendants for their "negligence, acts or omissions or legal liability" resulting in bodily injury while riding the horses. The Release Agreement contained multiple other provisions releasing the Lajitas Defendants from liability for Sherri's personal injury claim, including an assumption of all risks and dangers from the trail ride—encompassing the possibility that the horses could react unpredictably in response to sounds or objects on the premises and that the defendants were not responsible for any injuries resulting from any such reactions.

Sherri has not cited any cases supporting that such language is insufficient to release the Lajitas Defendants from liability for her negligence claim. To the contrary, various courts have found virtually identical language in release agreements signed by participants in other events sufficiently specific to meet the express negligence doctrine. *See, e.g., Van Voris v. Team Chop Shop, LLC*, 402 S.W.3d 915, 920 (Tex. App.—Dallas 2013, no pet.) (paragraph stating student is releasing, waiving, discharging and covenanting not to sue "the martial arts facility" for all claims "arising out of or relating to the event(s)" . . . "alleged to be caused in whole or in part by the negligence of the release or otherwise" was sufficient to constitute a valid release under the express negligence doctrine where other paragraphs contained multiple references to the "risks and dangers" of martial arts events and activities); *Quintana*, 347 S.W.3d at 451–52 (release agreement was sufficiently specific to cover CrossFit participant's negligence claim by expressly stating participant was waiving, releasing, and discharging defendant from "any and all liability, claims,

16

demands, actions or rights of action, or damages of any kind related to, arising from, or in any way connected with [her] participation" in the CrossFit program, "including those allegedly attributed to the negligent acts or omissions of the above mentioned parties."); *Tex. Eng'g Extension Serv. v. Gifford*, No. 10-11-00242-CV, 2012 WL 851742, at *4 (Tex. App.—Waco Mar. 14, 2012, no pet.) (mem. op.) (release language released defendant from negligence claim by stating participant in a training program does "hereby release, indemnify, and covenant not to sue" for "any and all liability, claims, costs and causes of action arising out of or related to any property damage or personal injury, including death, that may be sustained by me, while participating in such activity, or while on the premises").

We therefore conclude that the Release Agreement clearly stated the parties' intent to release the Lajitas Defendants from liability for a future negligence claim brought by Sherri resulting from her participation in the trail ride.

### b. The Release Agreement was not limited to accidents from natural causes

Sherri posits that even if the Release Agreement expressed the intent to release the defendants from a negligence claim, the intent was limited to claims arising from "natural" conditions on the premises, not man-made conditions like the sprinkler system that resulted in her injuries. In support thereof, Sherri points to the "Wilderness Experience" paragraph, which states the Stable is "not responsible for total or partial acts, occurrences, or elements of nature and/or sudden and/or unfamiliar sights sounds and/or sudden movements that can scare a horse, cause it to fall, or react in some other unsafe way." Sherri argues that because "elements of nature" is not followed by a comma, "elements of nature" modified everything that comes after it. She therefore contends the parties only intended to release the Lajitas Defendants for injuries resulting from a

17

horse's reaction to a sound or object in the natural landscape rather than those resulting from man-made conditions. We disagree.

Whether the lack of a comma after "elements of nature" causes the following phrases to modify only "elements of nature" is immaterial. First, although the term "and/or" is unfavorable in pleadings or jury verdicts, in contracts, "and/or" is generally understood to mean "both or either." *See Horseshoe Bay Resort, Ltd. v. CRVI CDP Portfolio, LLC*, 415 S.W. 3d 370, 377 (Tex. App.—Eastland 2013, no pet) (recognizing that although the term and/or has been criticized by legal scholars, its meaning is "both or either"); *Sedillo v. Valtierra*, 115 S.W.3d 52, 53 (Tex. App.—San Antonio 2003, pet. denied) (recognizing that the term "and/or" is "used to imply that either or both of the things mentioned may be affected or involved.") (citing Random House Webster's College Dictionary 49 (2nd ed.1999)); *see also* Ira P. Robbins, *"And/or" and the Proper Use of Legal Language*, 77 Md. L. Rev. 311, 333 (2018) (recognizing that despite criticisms of the term "and/or," it has a "definite, agreed-upon meaning" when used properly to signify "A or B or both."). Thus, the provision is reasonably interpreted to mean that the Stable was "not responsible" for incidents arising out of the "elements of nature," or other incidents caused by unfamiliar sights, sounds, or sudden movements that could scare a horse and cause it to react in an unsafe way, or both.

Second, that the sentence includes incidents caused by unfamiliar sights or sounds—regardless of their source—is reinforced in the last sentence of the same paragraph, which provides examples of risks involving both "natural and man-made changes in landscape."

Third and most importantly, regardless of whether the "Wilderness Experience" paragraph was intended to include man-made changes in landscape, as discussed above, it is not the only

18

provision in the Release Agreement describing the types of negligence claims that Sherri was releasing by signing the Release Agreement.

Accordingly, we overrule Sherri's first issue and conclude that trial court properly granted summary judgment because the Release Agreement constituted a valid and enforceable release of Sherri's negligence claim. Given our conclusion, we need not address whether the Texas Equine Act also barred her claims.

## CONCLUSION

We affirm the trial court's order granting summary judgment.


LISA J. SOTO, Justice

April 28, 2023

Before Rodriguez, C.J., Palafox, and Soto, JJ.